My name is Eric Schnapper. I represent the Plaintiff Appellant. I'd like to reserve seven minutes of my time for rebuttal. You have a clock in front of you. It'll start counting down. Thank you. And whatever's left there is yours. I got it. If you go into red numbers, then it's whatever we give you. Thanks. This case actually raises three distinct issues. I just want to put them on the table, and then I'll start on one of them. The first, in the order in which they sort of appear in the original panel opinion, the first question is whether, assuming that the plaintiff should be treated as a minister for the purposes of the ministerial exception doctrine, that even is a barrier in this particular minimum wage claim. The second question is what's the general standard for determining who's a minister for the purposes of the ministerial exception doctrine. And the third question is whether the complaint has to be read as alleging some conduct on the part of Mr. Rosas, which would be the sort of conduct that would fit within the ministerial exemption, suitably defined. So I thought I would start with the second question, because that's the problem that gives rise to the conflict of standards that the panel a note. And that's the question about how one generally would determine whether an individual should be treated as a minister for purposes of the ministerial exception. Counsel, excuse me. Counsel, don't you have at issue as a starting point the Constitution of the United States? Well, yes, Your Honor. The underlying question here is whether the application of the Washington minimum wage law is unconstitutional here. And I was just trying to delineate the subsidiary constitutional questions that are raised. But that is the question. There's not actually an exception. The question is whether this statute is unconstitutional as applied in this case. Just tell me. I just wanted to know whether counsel was conceding that he was a minister, and I think he shook his head no. No. No. I'm just we think he's not for two reasons. First of all, he's in training for the priesthood, is he not? I mean, he's basically selected by his bishop in Mexico for seminary training. And he's sent to the Archdiocese of Seattle for training to become a priest, right? That's the point. Can I get an answer to my question? Doesn't the complaint say he was hired to do maintenance? Can I get an answer to my question, please? We contend he's not a minister. Those are an accurate description of the facts. And as Judge Pegersen. It's not fair. It's Pegersen. Go ahead. Just say Your Honor. No, it is Pegersen. It is Pegersen. No, no, no, no. He tries to pass the flag. But as you say, the record also reflects that the complaint alleges he was hired to do maintenance work. I mean, the question is what are we to do with these facts? What are the standards? I gave you a factual predicate. Are there any facts in my question that are incorrect? No. He is seminary. He's training for the priesthood. And he was in Washington pursuant to a placement. Now, let me ask one other question, counsel. As I read the record, upon completion of this training exercise or whatever he was doing, he was to be ordained into the priesthood. But he completed all of his studies in Mexico and was otherwise fully qualified. So when he returned, he would have been eligible for ordination. Is that correct? I don't believe the complaint alleges that. I don't know that it's not true. But the complaint, I think, just alleges he's been training. The record reflects it. Could my son have completed for that job? I'm sorry? Could my son have gotten that job? Well, we don't know. We don't know that. I mean, this is here on a motion to dismiss rather than a summary judgment. On a more complete record, the answer would be clear. We know that he's there pursuant to a placement from the seminary. What we don't know is how this all worked. Were they just looking for a maintenance worker? They had a local agnostic. He got hired for a better wage by the Baptist. They were looking around for someone else. He did perform mass, participate in mass, right? The allegation is he assisted with mass. We don't know what that means. Again, it's an important adjective. The placement was a ministerial placement, correct? That's what you alleged. Well, it. Ministerial placement. He was in Washington as part of his ministerial training. He was part of his training. Yes. I mean, I don't think the panel or any of the parties suggest that whether it's labeled ministerial or not by the seminary would change things. Let me ask. I'm sorry, Judge Bailey. No, that's okay. This has to do with what you said was the second subsidiary question. What is the standard by which one decides whether someone fits within the constitutional minimum ministerial exception? And it strikes me that the parties have focused on these very broad tests that are put forth in the various circuits. But it seems to me that we might, and I think the questions that you've heard so far are going towards what strikes me about this case. If the plaintiff had completed the training and become a priest, clearly the ministerial exception would apply. And so my question is whether in this case we don't even have to get to what is the grand, broad standard, so much as a much narrower issue where someone is doing a task as part of their training to become a priest, minister, rabbi, imam. Why is that part of the ministerial exception regardless of what the broader test might be in a more subtle or difficult circumstance? I think the way the law, our view of this is that there appears to be a line of thinking in these cases that someone who's an ordained minister is within the ministerial exception. Do you agree with that or disagree with that? Do you think the minimum wage law covers a priest who's acting as a priest? That can't be a novel question to you. No, it comes up in a variety of different circumstances. I'm trying to think. There are circumstances, Judge Hulman asked a question at the panel, and posed a situation where I think the minimum wage law couldn't constitutionally be applied. There is a case, Southwest Baptist, where they held that ordained maintenance workers were not ministers, correct? Yes. Because that wasn't, the ordination wasn't a requirement for their performing the maintenance job, but they were ordained as Baptist ministers. But the function of what they were doing was maintenance work. So that opinion at least said the ordination doesn't cover a priest. But generally, if one is a minister and is performing ministerial duties, the fact that there's a wage law that could be imposed upon the regime that they work as ministers, are you contending that somehow a wage law can be applied to a minister, an ordained minister? Your Honor, the – given the sort of the – Who's performing as a minister. It wouldn't implicate the ministerial exemption doctrine. There might be free exercise problems. There are all the legion of cases, counsel, that say, including in this circuit, that when you are dealing with a minister who is performing ministerial functions, one of the things that's part of that is the hours and working conditions under which they work. So why is there – There are three such cases, two of them in this circuit. None of them presented those circumstances. I mean, even if we assume that the laws couldn't be applied to an ordained minister, that's not where we are here. And, I mean, that's just not the facts of this case. I've looked at your pleadings. I think we're all having trouble with this. And that is your pleadings allege that he is part of a ministerial training program. It uses the word and the chronological sequence, and you've adverted to it, is that he was then hired to do this maintenance work and he assisted in the mass. Now, the district court ruled that those allegations were enough to put him into the ministerial category. You sought or your – did you file the pleadings in this case? No. I came in to help. Okay. Whomever did, then, as I read the record, as I understand the record, there was a – post that ruling, there was a motion for leave to amend. None of those allegations were part of the proposed amendment, as I read it. So whatever problems that the court identified with your – with the original pleading were not corrected by some tender that you could elaborate on whether he was hired, as you say, to replace some secular maintenance worker. And this was sort of an add-on job that allowed him to earn some money to pay for seminary fees or whatever. So where was this case going? Well, the panel's view – the panel, I think, was more specific about why he would qualify as a minister – was – set out a standard and then thought the standard was met here. And on that standard, as least I understand it, if he was doing anything at all of a religious nature, that was sufficient. It didn't matter how often, how important, if he – and the assumption was assisting with mass would qualify. But Mr. Schnapper, under any of the standards applied by any of the circuits, including the one that the panel in our court came up with, doesn't your client lose? I mean, we have to accept as true the pleadings. And as Judge Fischer just indicated, he was going to be a minister. He was in the program. He is – he is the quintessential person, presumably, that is covered by these. Can you cite me any case from any circuit where someone with the factual pattern in this case was found not to be covered by the ministerial exception? No, I don't think there are any seminary – other seminary cases at all. I mean, it's in that – You do agree that we have to take as being true what was pled in the complaint, right? Yes, yes. I mean, if you were to adopt a rule that once someone enters seminary and school, he or she is a minister for purposes of ministerial exception, then we lose. I – we don't think that's the right rule, but under that rule, we would lose. I think we would lose. Insofar as the work at issue is part of the preparation, one can imagine that, you know, if you go to rabbinic school and you have summers off and you take a job mowing lawns or tutoring kids or something, that's completely separate. If it's – if it's – But here the problem is pleading – That would be like a minister who takes a summer off and – Right. And drives a truck. Right. Sure. The pleading here says that as part of preparation for ordination into the priesthood, the church required them to engage in this ministerial placement, and that whatever he did was a part of that ministerial placement. And I guess that's what I was trying to get at, that that seemed to me, if that – if we take that as true, all these sort of larger philosophical questions about the outer boundaries of the test seemed to me sort of an unnecessary detour. Unless your allegation – and that's why I was talking about the amended complaint – unless the allegation hired to do maintenance work was to signify separate and apart from the doctrinal curriculum and made a job offer to perform maintenance that would not have been required of the pope or any other area. But I didn't see that prophecy leave to amend or to amend the complaint on the wage and hour claim. So that's why I say I – one can theorize that if we take your complaint as true and give you the benefit of the doubt, that maybe that was a signal to that effect. But, you know, I don't know what to do. And the motion for leave to amend didn't make that. Sir, I have one other question. Is there anything in the record that demonstrates a payment by either the archbishop – or the bishop in Mexico or the archbishop in Seattle that he had to bear his own travel expenses, his meal expenses, his boarding expenses, or was that all at the expense of the church? The record is essentially silent on that. The only thing we know is that there's a reference to Rosa's driving up from California with Father Yanez. And at the very end, there's a reference to him being in church-provided accommodations. But that may have only been when he was at St. Benedict. Beyond that, the record doesn't contain those allegations. And if we got to a minimum wage claim, you know, providing a room and board would be part of the calculation, that would be. But there's no – it's not being defended on that basis. Counsel, I'm looking at page 235 of the record, which is the complaint for damages, the complaint – the operative complaint in this case. And I notice that there are really three separate times that are alleged. And you seem to put a lot of emphasis on doing maintenance work, but that's only with respect to 30 days in the year 2000. He returned in 2001 for 60 days. And while he did some maintenance, you allege in your complaint, he was also helping with liturgy, catechisms, and the youth group. And then on the August part of his placement, August of 2002, he was given the job of Hispanic minister, and then his duties include assisting the priests during services, working with the youth group, counseling. Isn't this pretty clearly ministerial work, and with the possible exception of 30 days in 2000? That's the other plaintiff, Your Honor. Pardon? That's the other plaintiff. That's Alcazar. Alcazar, okay. Rosas is – the complaint appears several places. The one I have is from page 203. And his work is referred to in paragraph 2.10. And this is the only allegation we have here. He was hired to do – I'm sorry. Go ahead. He was hired to do maintenance and also assisted with math. There were two plaintiffs in the case. Let's talk about maintenance, because that seems to be the sort of main concern. Correct me if I'm wrong, but my understanding is a part of ministerial training isn't just saying the words or remembering the liturgy, but it's patience, endurance, obedience. You know, there are various personal qualities that are developed as part of the training. I may be wrong about this, but that's my understanding. And how are we to judge whether saying go perform maintenance, you know, if he's told by his bishop or by his superior there in the church, whether that isn't just part of the training. This is part of becoming a priest is doing menial things, doing things that are not in and of themselves religious, but develop personal qualities of, you know, obedience, of being willing to do things that seem to be menial, because that's part of the qualities of dealing with parishioners.  I'm not sure. I think that's the problem with the direction in which the Court's going. The traditional ministerial exception doctrine was about safeguarding the right of a religious organization to select people that perform certain functions. It was about selection. And it was rooted in the view that the clergy of a particular religious organization are the lifeblood of the organization. They articulate its values. They propagate its views. They convert people who don't belong to the faith. As the doctrine has come to be elaborated, and I think Rayburn is the most widely cited example, it covers three kinds of activities. It covers that sort of expressive activity. It covers conducting religious ceremonies. And it covers administering religious orders or organizations. The conversation we've been having has been directed at a whole new branch of this, which would be that people training for the ministry would be covered. And then if you go there, then you have to figure out what would be encompassed within training. We think that's not ñ certainly that's ñ no, we don't think that falls within the traditional parameters of the ministerial exception. How are we to make that decision? If the bishop says, or his monsignor, whoever he is, says, I want you to spend so many hours polishing the brass or the silver on the pulpit, maybe that's to get clean silver, but may also be to show ñ to develop a sense of obedience and a sense of being willing to work hard and willing and diligent and fairness, and all those things, all of which are important values for a minister to have. You know, you're shifting focus a little bit. I understand there are orders of monks, like the Benedictine monks, that part of what they do is to make liquor, right? Benedictine. Again, I'm not an expert in these things, some of my colleagues may know better, but part of, as I understand, part of their performance as monks is that they tend these vineyards and they do all those functions for the organization. How would we decide whether this is ñ when the religious superior say, do this as part of your training or do this as part of your mission as a monk, how are we to second-guess that and say, no, no, it's just carpentry work? We're not asking to second-guess it. We're asking the Court to adhere to the traditional confines of the ministerial exception doctrine, which is it's for specific tasks or ordained ministers, and not to create another doctrine for ministers in training in anything they might do. Let me ask you this, because I don't disagree with what Judge Kaczynski has said, but are you ñ are you urging that we apply this primary duty test? Is that the test? Yes. Yes. Our view is that except for an ordained minister, that's the test we should use. Yeah. That's a good test. Now, one of the things that bothers me about this is that we don't know what the facts are here. We just ñ we have these allegations in the complaint, and there's some language in the ñ I think in the majority opinion that uses the word could be wrong on this. There's so many pieces of paper here uses the term subterfuge. I think ñ I know what I would be concerned with is someone doing work that doesn't apply to the religious order, but could be a substitute or a subterfuge for getting work done that's outside that realm. Now, I mean, I know people personally that have gone into orders where they don't speak for a year, and they paint and they work and they do things, and they ñ as part of their religious education, and that's fine. And I can understand about people doing menial work, because I've done that and it's good for the soul, especially when you stop doing that. But we just ñ you know, as far as I'm concerned, I don't know really what went on here. And I know there are certainly examples that I can think of where people who work for a church or a synagogue or a mosque or whatever it is aren't really performing primarily religious duties that are being used as cheap labor. And I haven't talked to her about this, but I suspect that that's what Judge Berzon was concerned about. But I have no problem with this primary duty test that the Fourth, Sixth, D.C., Third and Eighth Circuits have adopted, but the test that the majority opinion adopted is broad enough to allow for some exploitation. And, you know, if this was part of his religious training, that's fine. That's okay. That's good, I think. But we don't really know because of the ñ how summarily this matter was handled. That's what bothers me. And ñ Applying your primary duty test, how would we ñ How about if you have any comments on that? I think if the Court would apply the primary duty test that exists in the other circuits that you referred to, you simply couldn't decide at this stage in the proceeding whether the standard was met or not. It's possible on remand the defendant can make these allegations that may be right for some judgment, but not here. I haven't heard you say a word about primary. I've been otherwise occupied, Your Honor. How would you apply the primary duty test if the duties consisted of running a soup The ministry of exception doctrine as it exists is for ñ encompasses the functions that I described. I mean, the ñ Well, does that fit your test or not is what really ñ No, it would not. No, it would not. It would not, nor would any of the circuits that apply it. No. So if Mother Teresa goes into Harlem and administers to the sick and the needy because she sees that as her religious calling, you ñ she would be entitled to the minimum wage? Well, there ñ again, there ñ as your question from the panel argument raised, there may be free expression issues triggered in some cases by the minimum wage laws. But in terms of the ministerial exception, as it exists in the other circuits, it would not apply there. It's limited to the functions I described. Even if the religious doctrine was that Christ tended to the poor and the needy and that that's exactly what Mother Teresa is doing in Harlem? That is the law. All religions talk about treating the poor and the disabled and the homeless and the widows and the orphans. I mean, that's a major tenet of all true religions. Would it matter whether Mother Teresa was actually employed as opposed to Sue Esponte doing good work? It wouldn't, Your Honor. If I could close with that. The minimum wage laws in Washington don't ñ wouldn't apply to someone who just worked full-time with that, who performs services without pay in a religious ñ religious group. Counsel, before you leave, I appreciate the clarification between Mr. Alcazar and Mr. Rosas. But assuming Alcazar was still in this case, would the recitals that I made from the complaint tip it into the ministerial exception or not? I would think so. I think it really ought to be dealt with a summary judgment. We don't really know as much as we should. But it reads to me ñ I mean, he describes himself as being given a job as a Hispanic minister, as if that was the ñ that was the job for which he was hired, that was the standard used to select him. Those were going to be his primary duties. But when you allege in paragraph 2.10 that Rosas assisted with mass, that is clearly a religious ministerial function. Your Honor, we don't know enough about what that means. I mean, my son was in a religious-affiliated day school. All the teachers assisted with chapel. Most of them were not members of the denomination at all. The Jewish teachers would have been surprised to find out that they were Episcopalian ministers because they were assisting with the chapel. I'd like to reserve the balance of my time. Very well. Thank you. We'll hear from Appellees. Good morning, Your Honors. Mike Patterson on behalf of the Archbishop ñ Corporation of the Archbishop of Seattle. Preliminarily, I'd like to say that by his own words, Mr. Rosas is a minister under any test the Court might apply. The Rosas panel has provided us with a test that asks the right questions to determine the harder cases and initiates a reasonable and principled means to achieve consistent and appropriate results. If this case involved a 12-year-old boy who was employed by the Archdiocese, who was assisted in the Mass as an acolyte and was part of an organization that the Archdiocese, to train or to recruit young boys like that into the priesthood, would your argument be that he was a minister in training and because he was an acolyte, he was a minister and therefore not subject to child labor laws in the State of Washington? I think that's a hardÖ And that he could then be assigned on weekends to clean the toilets as part of his minister in training and that he could perform functions which would, in the ordinary lay sense, be secular duties all under the rubric that it was part of Christ's teaching to learn to wash the feet of the poor and so on and so forth, but he was mowing lawns or cleaning he would be exempt from the child labor laws? He may very well be. And I just pose this from my own experience. Would there be anything in the test or the standard, just to clarify, anything in the standard articulated in the panel opinion that would allow an argument that he wasn't a minister? As I understand the panel, what I call the modified functional approach taken from the Starkman case, the three questions that would have to be answered, and I think this would really be on the latter two, is whether a person was chosen for the position based largely on religious criteria. And then the last one, whether a person performs such religious duties and responsibilities. And I think under that test, given the hypothetical that you've given us, that indeed they would exercise or be subject to the ministerial exception. Counsel, my question has to do with the procedural posture of the case. We're dealing here with pleadings, not even up to summary judgment. And before granting judgment on the pleadings in your favor, we have to take all the pleadings most favorably to the other side. And the sentence that causes me pause is the sentence, Mr. Rosas was hired to do maintenance of the church. Now, one could, and the sentence continues, and he also assisted with mass. But he wasn't hired to assist with mass. He was hired to do maintenance of the church, and he also assisted with mass. So if we look at that sentence, just parsing it in his favor, wouldn't we have to say, this has to go farther towards summary judgment to see whether that was a part of his training or was a separate thing? And let me focus you on an example. We've had law clerks in our circuit who are ordained priests, ministers, et cetera. But when they are hired as law clerks, the normal labor laws that apply to law clerks would apply to them, because they're not doing the work they were ordained to do. They're doing law clerk work. So when somebody says he's hired to do the maintenance at the pleading stage, don't we have to view that as a separate act? No. And I think that the panel test on the first question would resolve the issue with regard to your law clerk. Well, but that's assuming that the panel test stays in the case. Right. That opinion has been withdrawn or vacated because of this proceeding. Right. So I just want to focus. I just answer that question and then get to the bigger picture, and I think I'm drilling in on the answer that I think you're looking for here. The question that was posed here was whether or not Mr. Roses was employed by a spiritual organization. Clearly, by his pleadings, he indicated that he was. But to get to your question about whether or not we need to delve further, I think that's really the crux of the case. And the crux of this case, as I see it, is whether or not this Court is going to adopt a primary duties test that, for example, was done in the Sixth Circuit under Hosanna-Tabor. Well, pretty much everybody except for maybe the Fifth Circuit has that primary duties test. Well, I think that even Rayburn and McClure talked about some functional tests in this regard. But even under Hosanna-Tabor, which I read as drilling down quantitatively, not qualitatively, and I think that that runs afoul of the entanglement with the Church-State issues, but even under the Hosanna-Tabor analysis, as I read that case, she was a teacher, and they drilled down to determine what her duties and responsibilities were and then tried to put percentages on that. But she was hired specifically to be a teacher. Roses was specifically hired for religious reasons. Well, no, it says he was hired to do maintenance of the church. That's – we're looking at the pleadings, and we have to look at them in the light most favorable to the other side. At this stage, you could very well win, no matter what, but we're just looking at the pleadings. Looking at the pleadings, he admits specifically that he was hosted in a training pastoral ministry program for the priesthood, paragraph 1.3. There is nothing in that counsel that says that part of that was to do maintenance. Why is there a separate allegation later on that says he was then separately hired to do maintenance? If he was already doing maintenance as part of his placement, what would the hiring allegation have to do with anything? It doesn't say he was assigned to do maintenance. It says he was hired to do it. So for all one could infer from the pleading is that, yes, he was there. He was part of his missionary mission to be in the United States, to be loaned out. He was placed. He was hosted and all of that. He was all part of a religious program. But separate and apart from that, because he needed the money or whatever reason, the church decided to offer him a maintenance job, and they hired him to do that. Now, it isn't artfully pled, but it isn't implausible. And then one could say, yes, none of the other seminarians in this place, before or after him, have ever done maintenance work. It's not part of the training. This happened to be a side job. There are primary duties cases around the country that would say, well, if you're looking to that aspect, that aspect is not doctrinal. He's not becoming a minister because of that. It's just work. We don't know if that's a fact. You can find that out on summary judgment. But he was required to engage in a parish outside of Mexico. You're not answering my question. I said I agree with that. Okay. But did that include doing maintenance work? Well, Your Honor, I think that where we're going here, it's a dangerous step, and that is if, in fact, you start to get into primary duties, and let's say that 10 percent of his duties were religious, 90 percent were doing other acts that were consistent with the fact that he was going to have to take the vow of poverty and the vow of humility and the vow of obedience, is it right for the courts to look and drill down on the motivations and the, as Judge Posner said, the internal affairs of the seminarian's work within the Catholic Church? Well, there's another way to look at it, though, and it's all fact-dependent, and that's the problem on the pleadings. Let's suppose that church posts in the Washington or the Seattle newspaper, the name of which escapes me at the moment, that we're hiring a maintenance worker. We just need somebody to come clean up. And somebody who happens also to be a minister in training says, wow, I could really, my family back home needs the money. I'll sign up for that so you don't have to hire somebody else. But it's not part of the training at all. It's just the maintenance job that was posted. That doesn't disturb anything about church doctrine or church training or the ministerial exception, and that kind of scenario would potentially be covered by the sentence in the complaint. And the problem here isn't, that's, I think with both sides, I'm sort of frustrated that we're dealing with these grand theories when we're really talking about something rather straightforward here, which is that we're only at the pleading stage, and we have to assume that the pleadings before you can win are entirely in favor of the other side. So in my example, would that be a violation of the First Amendment to require that maintenance job to be paid at the minimum wage? I think number one here is that the pleadings in and of themselves, because this was a motion under 12C, clearly indicated that Mr. Rosas was a minister, that he was required to be in this parish as part of his ordination trail, that he indeed was engaging in some religious activities. That doesn't answer my question at all. In my hypothetical, would there be a First Amendment problem with applying the minimum wage? Well, depending upon what questions were asked specifically, and I'm going to suggest that the Starkman analysis that was applied in this particular case here, they wouldn't meet question number two, and that is whether a person was chosen for the position based largely on religious criteria. So your answer is there would be no First Amendment problem. You just didn't want to say it in one syllable. There would be no First Amendment problem in my scenario where they posted a job and someone who happens to be in training says, gee, I'd like to compete for that too. I want that. No First Amendment problem, right? If they were not hired specifically under religious criteria in that particular context. What if they had to be Catholic to get the job? You're getting a hypothetical. What if they had to get the job? Can I? Right here.  What if they had to be a Catholic to get the job? Was that being selected on a religious criterion? Yes. Okay. What I'm concerned about, Mr. Patterson, is the potential scope of this. I appreciate your desire representing the archdiocese to cabin these kinds of concerns. But quoting briefly from our case, Bollard, we commented, a secular court may not adjudicate matters that necessarily require it to decide among competing interpretations of church doctrine or other matters of an essentially ecclesiastical nature, even if they also touch on secular rights. In this case, I'm having some difficulty finding what ecclesiastical doctrine we would be arbitrating. There's no doctrine involved here. What internal controversy are we dealing with? I appreciate the fact that you're probably right that this guy, under any test, is out because of the pleadings. But I'm concerned if we're looking at adopting for the circuit a test, a ministerial exception, I'm concerned that it will become amoeba-like and go to the point where almost all secular rules, however important they might be as a matter of policy, are gobbled up just because someone is employed by a church. And that's not the constitutional requirement. The point is we don't want to get involved in ecclesiastical disputes and disciplining of members and things like that, which was the common law basis for this thing in the first place. So I guess my concern is, what is your problem insofar as our circuit is concerned? Why would there be a problem with the primary duties test? Well, the problem with the primary duties test is this. And if you take it to the extent that Hosanna tabored it in the Sixth Circuit, then you start drilling down on percentages of time spent doing ministerial work versus other type of work. What if we cobbled to that an emphasis on functionality and say we have the primary duties, but in our circuit, as part of that, we're going to look at the function, we're not going to be looking at the percentage of hours at the altar versus doing cleaning. How would that work? Well, I think that's getting closer. And I think what this panel looked at was the Starkman case and saying how do we apply the functionality and at the same time make sure that there's no subterfuge going on here. So we ask these three basic questions, and if they're answered in the affirmative, then we don't need to go any further and we don't need to entangle ourselves into the internal affairs of the church. Yeah, but if you're worried about subterfuge, you are inquiring into the internal affairs just by the definition of that word. I think this, I don't, you know, whether it's quantitative or qualitative or whatever, you know, I don't care for those tests. But the problem here is we don't have any facts except I was hired to do maintenance. You know, so all you've got to do is have a motion for summary judgment and see what the facts are. And I'm sure if that's done, it's just going to come out just fine. But as we sit here, at least as I sit here today, I don't know what the facts are here. There's all kinds of stuff in these pleadings, you know. I would simply answer the question in this manner. I think the subterfuge issue can be handled. And all these is, you know, we just have to accept what's in the complaint is true on a motion to dismiss. You know, rarely granted. Well, I think on the subterfuge matter, I think that's better handled by the corporate issues when you initially establish yourself as a nonprofit religious organization. And the IRS has to buy off on that. I'm not worried about all that. Okay. You know, I just don't know what went on over here. You know, we have to take what's stated in that complaint is true. And then they wanted to amend it, and then that was denied, too. And so the amendments that Judge Martinez indicated that the amendment would be even moved at that particular point in time because he would still dismiss it. I read all that. Is he a U.S. citizen? Pardon me? Is Mr. Rosas a U.S. citizen? Not. Is he? How does he get a job in the United States? Do you have a work permit? They had a relationship with this Mexican diocese. No, no, no. I'm sorry. In terms of U.S. immigration law. You can't, if you're not a U.S. citizen or permanent resident, you can't just come here and work. You can't get a job doing maintenance. I'm just wondering how he would get a job doing maintenance for the church. Because of the relationship between the two. It was because of his status as a seminarian, right? Yes. His status as a seminarian, and seminarians from this archdiocese went down to Mexico. Mr. Patterson, may I engage you for just a second? Yes. I take it you are satisfied with the test that was formulated by the panel? Yes, Your Honor, I am. Which has now been withdrawn, right? I'd like to have you look at the third element there, which says, performs some religious duties and responsibilities. Yes. Some religious duties and responsibilities. How are we to determine whether the work of a maintenance worker is secular work only, or has some part of religion imbued in it along the lines suggested by the questioning by the chief judge? In other words, it gives you, it imbues in you the virtues of humility and deference and obedience. Isn't this part of the test similar to primary duties? Doesn't it call for the court to entangle itself in religious doctrine to determine whether the duties are indeed religious? I don't believe so, Your Honor. Then why? Because the questioner, in this particular case, where he says, I was hired to do maintenance and to assist at mass, so some of his duties were religious in nature. And what this test does is it stops your inquiry there and says, you cannot entangle yourself in the internal affairs of the church and decide whether or not that maintenance work was motivated by his ordinational issues in ministry. But suppose the assisting of mass consisted of going down to the grocery store and buying some sacramental wine and delivering it to the priest. Which may very well be integral to that sacrament. How do we know that? Well, the question is how do we know that that is religious? Well, I think that you need to take a look at Rayburn and McClure, and you talk about spiritual and pastoral mission. And if, in fact, that's the spiritual and pastoral mission of that seminary to provide assistance. Isn't that Judge Bea's point? Yes. We have to go in order to decide what the assistance was. We would have to find out whether it was as mundane as going down to the grocery store and getting the sacramental wine. What if it was setting up the chairs in the chapel? What if it was standing out in front and directing the traffic in the parking lot? How can, on just the statement that he assisted in the mass, how can we as a court decide that it is religious unless we take the next step and at least make the threshold inquiry as to why the church contends it's religious? Or is it just the statement assisting the mass is enough? I think that's enough. And it's certainly under 12C where it comes from the plaintiff themselves. And I think when you start making that inquiry and you start asking those questions, then you are simply violating the very purpose of the First Amendment here insofar as entanglement in the internal affairs and the spiritual and pastoral mission of the church. So if, take a ridiculous example, say that the archdiocese decided that we're losing our young people too early. And it got a group of 110-year-old boys and set them to work in, let's say, very primitive conditions, cleaning up and painting various chapels around the city. And let's say that under the secular law there would have been violations of child labor laws. There might be all kinds of OSHA requirements and the like. Is it your position that if those young people were paid, that the laws would not apply here because this was a religious requirement or some kind of a religious benefit that would come to these young people? Yes, and I think if they met all the three answers to the questions here, I believe that would be so. And I guess hypothetically, and it's not a hypothetical, but I entered the seminary when I was 12. You have such a core of 100 young people. The core was much younger then. It's now gotten older, but it was certainly that core at that particular point in time. And the church will start indoctrinating these issues very early on. And that's the whole point. Under canon law and under the religious, spiritual, pastoral mission of the church, how does this court determine whether or not 10 years old is too early as opposed to 15-year-old or 18-years-old? In effect, does not that give the church permission to do anything that it wants with respect to the use of labor-type issues or child-type issues just because it says this is covered in the doctrine? I mean, I'm an empathetic guy on this in the sense that I'm a religious guy, and everybody here is. But the reality is, where is this balance here? I realize the Constitution says you cannot have secular courts involved in church doctrine, but there is an important principle involved here. How do we separate this? I just think you're asking us to go way too far than what the Constitution requires. Well, I'm going to suggest that the Alamo case is a good example of how you deal with that, where the Department of Labor came in and investigated to determine whether or not this was really religious purpose. And they found that under the Department of Labor regulations that that was a commercial enterprise, and it was defined as a commercial enterprise. And as a result of that, they denied them the religious exemption. And I think that's the way to do it. And if the IRS determines that they are not carrying on their function as a religious organization, then they can come in and shut them down. Well, how can they do that? Counsel, I just don't understand. You're saying that the IRS, a bureaucratic executive agency, can make those determinations with whatever political agenda they may come by. But you would prefer them to do the inquiry that you're saying the courts should stay out of? Well, and I'm getting to the point of the claim of subterfuge, and are they really doing the religious purpose issue? Right. So you are saying that if, under Judge Smith's hypothetical, the IRS came in or the Labor came in and examined the bona fides of the archdiocese or the parish in that particular hypothetical and said, no, you've exceeded your church doctrine. What you are doing is using child labor. That would be okay. But the children couldn't come to the courts and say, I have been, I myself as a child have been taken advantage of, because the court somehow would intrude as a secular body, whereas on the enforcement side you're suggesting would be just fine. Well, under the Alamo analysis, for example, I mean, they did come in and they said that you're running a commercial enterprise. There's something we can do about it. Well, you're describing a result. I'm asking for your position. You're endorsing. So what you're saying, yes, it's okay to go behind the child labor law violations and all of those, so long as it's not the courts that are doing it. It's okay for the state to do it, for the federal government to come in, but not the courts. That's correct, because once they've been designated as a religious organization, and there's all sorts of cases where the IRS, for example, has come after the Church of Scientology for that very reason. But once they're a religious organization, and to have these courts determine and delve down and find out what they're doing on a quantitative basis, I think is the entanglement issue that all of the courts have been weighing and trying to deal with, and what test is applicable and how far do you go. And I think the Starkman test that was adopted here with the three questions, at least from a threshold point of view, stops you at the gate before you get down to the entanglement issue. But what's the difference, realistically, Mr. Patterson, between the IRS, a gentle, kind agency doing this, as opposed to, for example, our remanding this back to the district court for further limited discovery to find out exactly the circumstances in which Mr. Rosas was working? Why should we, given the theory that you're talking about, why should we just take the pleadings and why not send it back and say, okay, let's really check this out? Why isn't it the example that Judge Graber gave, for example, that he has a family problem in Mexico. He knows he can earn a little extra money, and he volunteers to be hired as a laborer, qua laborer, having nothing whatsoever to do with the church. What's the matter with that? Because under the facts of this case, which is 12C motion, where it was admitted that the court would have to... No, and I appreciate it, but you're saying, you know, this is the rules, you've got to take these things as they're pled. But given this example, though, what's wrong with it from a constitutional perspective? Why couldn't we send this back for further inquiry if it's, you know, if we're comparing what the IRS can do? Why is this a problem? Well, because what you're asking the court to do at that particular point in time is weigh how much time he was using on the maintenance type of work versus assisting at mass. And then making a further inquiry, is that assistance at mass really part of the pastoral mission? It doesn't have to be that. Why couldn't it be, well, why did you do this, whatever his title is, a friar or whatever? Why did you do this work? Well, I was told to do it by the archbishop. End of story. You know? On the other hand, why did you do that? Well, my family in Mexico is very poor, and I decided extraneous from that that I wanted to work, help send the money there. Different result, perhaps. Do you see why we're struggling with this? I can see why you're struggling with this. But I see this case here as being on one end of the spectrum. And that one end of the spectrum. But that's only because you're not wanting to take, in my view, the pleadings most favorably to the other side. Because the problem sentence for you is he was hired to do maintenance of the church. And? And assisted with mass. Not hired to assist. He also assisted. Those are two separate things. Reading it most favorably to the other side, he was hired to do maintenance work. We don't know what that means. But he also said that he was a seminarian. And that he was a seminarian in the context of the church means he's a minister on his way to ordination. He said that he was on his way to ordination. He said it was a requirement for him to do this work in this church. He doesn't say that. Well, he doesn't say that he was required to do the maintenance as part of that. That's our problem. That's the missing link in the pleadings that wouldn't be a missing link if there were more facts. What if he said I was hired to become a law clerk and I also assisted with mass during that same period of time? I would submit that if, in fact, he was not a seminarian, came up here to inquire as to whether or not he'd be interested in the ministry, we may have a far different case. But he is up here specifically at the direction of the Catholic Church through a program where he is assisting at the parish as part of his training as a seminarian. Okay. Just so I can finish that hypothetical, then, let's suppose that he was not a seminarian. He came up to, in response to, forget his illegal status to set that aside, he came up in response to an open ad for a maintenance person. And the church said, we only hire Catholics. Are you Catholic? They selected him based on his religious statement. Okay. Is he a minister? No. And was he doing religious duties? Okay. So they hired him and they said, not only will you be a maintenance man, but, by the way, on Sundays you must assist in the mass. Then he'd be a minister and the exception would have been? Correct. Okay, because the panel standard has been met. Correct. Okay. Thank you. Thank you. All right. Thank you. If I could just make a few quick points. I was asked about the Southeast Baptist seminary case, which did involve seminarians. And in that case, the court of appeals didn't create a special rule for seminarians. It said you had to look at what they did and then send it back for, you know, for the creation of a record to see whether it met the Fifth Circuit standard. There have been a number of questions about suggesting the court might adopt a standard regarding subterfuge or bad faith. And it raised the pleading issue that I was asked about that I want to return to. The district court's view, similar to the view that I think my colleague just presented, was that if the plaintiff was involved in mass in some way, that was the end of the discussion. This is on page 120 of the record. The court recites, he was involved in conducting mass. That's the end of it. He's a minister. And we – and the point was made, we didn't amend to address that. There's no question he assisted mass at least once in some way. That's the end of the matter. We've cut ourselves out of court. If, on the other hand, the court is now going to adopt a standard under which subterfuge or bad faith would be actionable, then I think we're entitled to a chance to plead in that. That was not the standard that was applied below. That was not the standard in this or any other circuit. And as Judge Kaczynski's question tellingly points, this may be that case. There's – all we have in the pleadings is that once Mr. Alcazar and Mr. Rosas complained, the archdiocese contacted Federal immigration officials. And the answer alleges – the answer alleges that the plaintiffs had immigration problems. So this may be a situation that would fit that. We're entitled to plead to it. Do I understand you correctly? You want to remand to allow you to amend? If you're going to change the applicable legal standard, I think we're entitled to try to meet a new standard. You've already amended once. If you're going to adopt a new standard, I think we're entitled to – we're not entitled to fix something we should have fixed before, but the district court didn't rule on this basis. Thank you very much. Okay. Thank you. The case is argued. We stand submitted. We are adjourned. All rise.
judges: Hearing Panel: Beezer, Gould, Tallman en Banc Panel: Kozinski, Pregerson, Beezer, O'scannlain, Graber, Fisher, Gould, Tallman, Bea, Smith M., Smith N. R.